**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MT. LOOKOUT - MT. NEBO PROPERTY
PROTECTION ASSOCIATION, an
unincorporated association,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
Respondent,

No. 97-1376

CITY OF SUMMERSVILLE, West
Virginia,
Intervenor.

AMERICAN WHITEWATER AFFILIATION,
Petitioner,

v.

FEDERAL ENERGY REGULATORY

No. 97-1377

COMMISSION,
Respondent,

CITY OF SUMMERSVILLE, West
Virginia,
Intervenor.

MT. LOOKOUT - MT. NEBO PROPERTY
PROTECTION ASSOCIATION, an
unincorporated association,
Petitioner,

No. 97-2058

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
Respondent.

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission.
(FERC 10813)

Argued: January 26, 1998

Decided: May 1, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Murnaghan and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Richard Roos-Collins, NATURAL HERITAGE INSTI-
TUTE, San Francisco, California; James Wilbur McNeely, Green-
ville, West Virginia, for Petitioners. Samuel Soopper, FEDERAL
ENERGY REGULATORY COMMISSION, Washington, D.C., for
Respondent. Earle Duncan Getchell, Jr., MCGUIRE, WOODS, BAT-
TLE & BOOTHE, L.L.P., Richmond, Virginia, for Intervenor. **ON
BRIEF:** David N. Cook, Acting General Counsel, Jay L. Witkin,
Solicitor, John H. Conway, Deputy Solicitor, FEDERAL ENERGY
REGULATORY COMMISSION, Washington, D.C., for Respondent.

James L. Sanderlin, Stephen H. Watts, II, Patrick T. Horne, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Intervenor.

_____

**OPINION**

NIEMEYER, Circuit Judge:

In 1992 the Federal Energy Regulatory Commission ("FERC"), acting pursuant to the Federal Power Act, 16 U.S.C.§ 791a et seq., granted a 50-year license to the City of Summersville, West Virginia, to construct and operate a hydroelectric power generation plant on the Gauley River in south central West Virginia. The license included the right to transmit power to a Monongahela Power Company substation over an eight-mile-long, 138-kilovolt transmission line running northward from the plant. About three years later, in 1995, the City of Summersville sought to amend the license to reduce the size of the power plant and to run the transmission line southward from the plant for 9.6 miles to an Appalachian Power Company substation. Although the Mt. Lookout-Mt. Nebo Property Protection Association ("the Association") and the American Whitewater Affiliation ("the AWA") challenged the location of the revised transmission line route, FERC granted Summersville's application for amendment by order of October 18, 1996. On appeal, the Association and the AWA raise both procedural and substantive objections to FERC's approval of the amendment. For the reasons that follow, we affirm.

I. Statement of the Case

The City of Summersville is located in Nicholas County, West Virginia, near the scenic Gauley River. In connection with a flood-control dam constructed on the Gauley by the U.S. Army Corps of Engineers, FERC licensed Summersville in September 1992 to construct and operate a hydroelectric power plant, using the dam's outflow as its source of power. The license, which was granted following appropriate environmental review, authorized Summersville to transmit power to a Monongahela Power Company substation over an eight-mile-long, 138-kilovolt transmission line running northward from the power plant.

3

Because of economic concerns and an inability to reach agreement with Monongahela Power Company, Summersville decided to reduce the size of the plant and to enter into an agreement to sell electric power to Appalachian Power Company at its substation south of Summersville in Fayette County. The agreement would require Summersville to transmit 69 kilovolts of power over a 9.6-mile line running southward from the power plant and crossing the Meadow River, which runs westward and ultimately feeds into the Gauley River.

To effect the change in its proposed power plant and relocate the transmission line, Summersville filed an application with FERC in September 1995 for an amendment to its license. The amendment would authorize Summersville to reduce the number of turbines at its power plant from four to two and to construct the 9.6-mile transmission line to the Appalachian Power Company substation in Fayette County. The proposed corridor for the line would have a maximum width of 80 feet. In its application, Summersville indicated that it had notified three West Virginia state agencies and four federal agencies of the proposed amendment, as well as 23 property owners whose property would be crossed by the power line. FERC thereafter published notice of Summersville's application in the Federal Register and in the Charleston Gazette, the newspaper with the largest circulation in Nicholas County and the second largest in Fayette County. The FERC notices provided that comments and motions to intervene from interested parties were to be submitted by December 4, 1995. A few months later, FERC completed a draft "Environmental Assessment" (or "EA") of the application and published notice of its availability in the Federal Register on May 9, 1996, requesting comments within 20 days.

The notices produced a number of comments. Comments from the National Park Service caused Summersville to move the transmission line several times so that it would not compromise the aesthetics of the Gauley River National Recreational Area, a public recreational area administered by the National Park Service. During the relevant time periods for public comment, however, neither the Association nor the AWA intervened in the proceedings or responded to the requests for comments. Indeed, the Association did not exist at the time, having been formed only on June 27, 1996, for the purpose of objecting to the location where the transmission line crossed the

4

Meadow River. The Association filed its first objections on August 15, 1996. In response to late comments from the Association and from others not party to this appeal, FERC decided to conduct a public meeting in Summersville on September 19, 1996, for the purpose of giving the public another opportunity to comment on the amendment application. Public notice of the meeting was given, and it was held as scheduled. The Association participated and presented its views.

The AWA did not object to Summersville's application until October 8, 1996, when it filed its motion for late intervention. In its papers, the AWA expressed concern about the effect of the transmission line on whitewater recreation on the Gauley and Meadow Rivers.

On October 18, 1996, FERC published its order granting Summersville's application for amendment and its final Environmental Assessment, which it attached to the order. The order also granted the motions of the Association and the AWA for late intervention and addressed the substantive issues raised by them.

With respect to the adequacy of notice complained of by both the Association and the AWA, FERC explained that although the initial notice given by Summersville in connection with the filing of its application had been "far from ideal," any defect in the notice had been cured by FERC's giving notice of the application by publication in the Federal Register and in the Charleston Gazette and by its giving notice of the draft Environmental Assessment. FERC observed that public notice was also given in connection with its meeting on September 19, 1996. It found that any defect in the notice procedure which remained had also been cured by the fact that "interested persons have had actual notice of this proceeding" and that both the Association and the AWA participated.

On the merits, FERC addressed in some detail the Association's and the AWA's challenges based on alleged compromises of the aesthetic integrity of the Meadow River. FERC stated that the transmission line would be visible to rafters on the Meadow River

> for only a brief period as they pass beneath the portion of
> the line that crosses the river. The remainder of the line will

5

not protrude above existing vegetation, and only 80 feet of shoreline (out of a total of five miles) will be cleared by the right of way. The licensee will use wooden poles that will blend with the existing forest, will plant trees along the transmission line corridor, and will keep the width of the corridor to the minimum needed. Thus, the transmission line will not have significant adverse impact on the aesthetic quality of the Meadow River Gorge.

In comparing the transmission line route proposed by Summersville with an alternative route proposed by the Association, FERC stated that neither "would significantly impact the environment" and that the "impacts associated with the two routes are similar." The order explained:

> The 11.2-mile-long route proposed by the Association is 1.3 miles longer than the 9.9-mile-long route proposed by the amendment. Thus, the Association's route would affect an approximately 12 percent greater area and cost approximately 12 percent more than the route proposed by the licensee.

> Given that the two proposed routes have similar overall impacts, but that the Association's route would have a slightly greater environmental impact due to its greater length and higher cost, we adopt the EA's conclusion that the route proposed by the licensee is environmentally preferable.

While FERC selected Summersville's proposed route, it imposed a requirement that Summersville consult with affected landowners in "developing a final design plan" for construction of the transmission line. Based on its conclusions in the final Environmental Assessment, which it attached to its order, that neither of the routes would significantly affect the environment, FERC concluded that it was not necessary to prepare a formal Environmental Impact Statement ("EIS"). Subject to the new condition that it imposed requiring Summersville to consult with landowners, FERC approved the amendment to Summersville's license.

6

The Association and the AWA filed petitions for rehearing, which FERC denied on January 21, 1997.

Parallel to its application for amendment, Summersville filed a Visual Resource Protection Plan on September 23, 1996. This document was filed pursuant to Article 409 of the original license, which required Summersville to minimize the visual impacts of the project in the power plant area in consultation with the National Park Service, the AWA, the Corps of Engineers, and the West Virginia Professional River Outfitters. The Plan proposed gratuitously to apply the requirements of Article 409 to the entire proposed transmission line "to reduce the visual impacts of the project by constructing project works so that they would blend into the landscape, and by planting a variety of shrubs and trees to screen the project from view to a substantial degree." FERC approved Summersville's Plan on February 19, 1997, and the Association filed a petition for rehearing, complaining that it had had no opportunity to comment. FERC denied the petition for rehearing on July 1, 1997. Although FERC noted that the Association had no right to intervene in the Plan proceeding under Article 409, it entertained, sua sponte, its objections that the new route would have unacceptable visual impacts, stating:

> The Commission carefully considered these assertions and, based on the environmental assessment prepared by our staff, concluded that the environmental impacts of the route proposed by Summersville, including visual impacts, would not be significant. In response to the concerns regarding the portion of the new transmission line routing not near the dam and therefore not covered by Article 409, the Commission added Article 414, requiring that the final design plan for the transmission line be developed in consultation with affected property owners, the U.S. Fish and Wildlife Service, and West Virginia Resource agencies.

The Association and the AWA appeal the orders entered by FERC approving the license amendment, approving the Visual Resource Protection Plan, and denying their petitions for rehearing. They present the following issues: (1) whether sufficient notice and opportunity to be heard on Summersville's application was given; (2) whether FERC's decision not to prepare an Environmental Impact Statement

was supported by substantial evidence; (3) whether FERC considered reasonable alternatives to the transmission line route as required by the National Environmental Policy Act of 1969; (4) whether the Visual Resource Protection Plan was adequate; and (5) whether the Association and the AWA can advance new arguments on appeal. We address these issues seriatim.

II. Adequacy of Notice

The Association contends first that neither Summersville nor FERC provided it with adequate notice of Summersville's application, with the result that the Association was unable to participate meaningfully in the license amendment proceedings. The Association argues, in particular, that the proper documents were not mailed to property owners affected by the amendment, as required by 16 U.S.C. § 802(b)(1). Section 802(b)(1) provides, "Upon the filing of any application for a license . . . the applicant shall make a good faith effort to notify [a]ny person who is an owner of record of any interest in the property within the bounds of the project."

Summersville's application asserts that it notified each property owner whose property would be crossed by the proposed transmission line, as well as state and federal agencies, of its application. Moreover, FERC found that these notices were in fact provided. At the time that Summersville gave these notices, however, the Association was not in existence. Indeed, it was formed in June 1996, after the time for responding had expired, for the very purpose of opposing the proposed route of the transmission line. In order to form an association for that purpose, however, the Association's organizers necessarily must have known of the proceeding's existence.

Moreover, because of the Association's late comments, as well as late comments by others, FERC left the record open and conducted a public meeting in Summersville in September 1996 for the specific purpose of receiving all views on the project. The Association attended the meeting and testified. It also submitted written materials in support of its position.

Finally, the Association's motion for late intervention was granted and all of the points raised by it were considered by FERC and

8

addressed in its October 18, 1996 order approving the license amendment.

In these circumstances, we fail to understand how the Association can claim a lack of notice, and we reject this procedural challenge to the amendment.

In addition, the AWA contends that FERC failed adequately to consult with affected governmental agencies as required by the Federal Power Act. In particular, it alleges that Summersville failed to consult Fayette County and consulted inadequately with the National Park Service. Section 802(b)(2) of Title 16 requires that the applicant for a license or amendment make a good faith effort to notify "[a]ny Federal, State, municipal or other local governmental agency likely to be interested in or affected by such application." Moreover, § 803(a)(2) mandates that, in approving a project, FERC must consider "[t]he recommendations of Federal and State agencies exercising administration over flood control, navigation, irrigation, recreation, cultural and other relevant resources of the State in which the project is located."

Contrary to the AWA's assertion, the record in this case shows that FERC did consult with Fayette County. Indeed, Fayette County approved of the project and took affirmative steps in support of it. Likewise, Summersville consulted the National Park Service and acted on its suggestions on various occasions, moving the location of the transmission line several times in order to satisfy the Service's desire to protect the Gauley River National Recreational Area.

Although FERC recognized that Summersville's initial notice to landowners was "far from ideal," it correctly observed that any deficiency was cured by FERC's subsequent notice published in the Federal Register and in the local newspaper. Any doubt about the adequacy of that notice is further dispelled by the fact that the property owners, the Association, and the AWA had actual notice. Not only was an adequate opportunity to participate thus provided, but the opportunity was in fact taken and numerous private and public groups actually participated in the proceedings before FERC. Accordingly, we conclude that the notice requirements of the Federal Power Act were satisfied.

9

III. Environmental Impact Statement

The Association and the AWA next argue that FERC erred in deciding that an Environmental Impact Statement was unnecessary. FERC conducted an Environmental Assessment in which it concluded that the proposed redesign and relocation of the project powerhouse would "decrease the overall impacts of construction at the dam by reducing the size of the facility and siting it on the shore instead of in the middle of the river." With respect to the alternative transmission line routes, FERC concluded:

> The impacts of the licensed [route], the licensee's proposed transmission line route and the Association's [route] are similar. However, since the licensed route is not economically feasible, we will base our conclusion on a review of the licensee's and the Association's proposed routes.
>
> In general, both would have minor adverse impacts on soils, vegetation, wildlife, land use and aesthetics and no impacts on human health, water quality, fisheries, and cultural resources. Our review of the routes did not identify any resources that would be significantly impacted.

Based on these conclusions, FERC determined that it was not required to prepare an Environmental Impact Statement.

The parties agree that FERC's review of Summersville's application for amendment must include compliance with the National Environmental Policy Act of 1969 ("NEPA"), as amended, 42 U.S.C. § 4321 et seq., which applies to any major federal action which may have a significant effect on "the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also North Carolina v. City of Va. Beach, 951 F.2d 596, 603 (4th Cir. 1991). The Council on Environmental Quality regulations implementing NEPA require each federal agency to prepare an Environmental Assessment, i.e., a document that contains sufficient evidence and analysis "for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). Thus, if the environmental assessment results in a finding of no significant impact, the agency is not required to prepare an Environmental Impact Statement.

10

An agency's decision to rely on an Environmental Assessment instead of preparing an Environmental Impact Statement is entitled to deference from the courts. South Carolina v. O'Leary, 64 F.3d 892, 896 (4th Cir. 1995); Providence Rd. Community Ass'n v. EPA, 683 F.2d 80, 82 (4th Cir. 1982); see also LaFlamme v. FERC, 945 F.2d 1124, 1128-29 (9th Cir. 1991) ("We review the Commission's decision not to prepare an EIS by considering whether it reasonably concluded that the Project would have no significant adverse environmental consequences"). Thus, our review is limited to the question of whether FERC reasonably concluded that the license amendment would not significantly impact the quality of the human environment. See City of Alexandria v. Helms, 728 F.2d 643, 646 (4th Cir. 1984). Only if the environmental assessment leads FERC to conclude that the applicant's proposed major federal action may have a significant environmental impact must it require the preparation of a formal Environmental Impact Statement. See 18 C.F.R. § 380.6; 40 C.F.R. § 1501.4.

In compliance with NEPA, FERC prepared an Environmental Assessment in which it evaluated the impact of the proposed revised power plant, the proposed transmission line route, and the Association's proposed transmission line route on geology and soils, water resources, threatened and endangered species, land use and recreation, aesthetics, and cultural resources. Following its lengthy analysis, FERC concluded that both of the proposed transmission line routes would impact the environment similarly, and neither would impact it significantly:

> [B]oth would have minor adverse impacts on soils, vegetation, wildlife, land use, and aesthetics and no impacts on human health, water quality, fisheries, and cultural resources. Our review of the routes did not identify any resources that would be significantly impacted.

It also noted that the specific plans proposed by the licensee "will adequately mitigate any [adverse] impacts." Because we find that FERC's analysis is supported by the record and is reasonable, we will not disturb its conclusion that no Environmental Impact Statement was required.

11

IV. Reasonable Alternatives

The Association and the AWA also contend that FERC did not consider an adequate range of alternatives in approving the location of the transmission line. Under NEPA, federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action. See 40 C.F.R. § 1502.14 (agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" when EIS required). In this case, when FERC determined that an EIS was not necessary, it was required only to "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) (emphasis added); see also North Carolina v. FAA, 957 F.2d 1125, 1134 (4th Cir. 1992) ("In an environmental assessment, the range of alternatives an agency must consider is smaller than in an environmental impact statement"); Friends of the Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992) (same); Olmsted Citizens for a Better Community v. United States, 793 F.2d 201, 208-09 (8th Cir. 1986) (same). We review FERC's decision as to the appropriate range of alternatives for abuse of discretion. See Ompompanoosuc, 968 F.2d at 1558.

In this case FERC considered three alternative transmission line routes: (1) the route proposed by Summersville in its application for amendment; (2) the route proposed by the Association which would follow U.S. Highway 19 as it crosses the Meadow River; and (3) the northward route originally approved in 1992 with the license. FERC agreed with Summersville that alternative (3) was not economically feasible and that the proposed amendment was necessary to reduce the plant's size and cost. As between the remaining two proposals, Summersville's route and the Association's route, FERC found that the route proposed by Summersville was preferable because it was shorter. It explained, "By constructing the licensee's proposed route,

12

short-term and long-term impacts of the project's transmission line would be reduced by approximately 12 percent. Further, the shorter route would be less costly to construct."

Thus, FERC did consider alternatives as required by NEPA, and we cannot say that the range of the alternatives it considered was unreasonable, particularly in view of the marginal difference in environmental impact between the two viable alternatives.

V. <u>Visual Resource Protection Plan</u>

Finally, the Association contends that the Visual Resource Protection Plan filed by Summersville under Article 409 of its original license and approved by FERC is inadequate because it does not adequately address the visual impact of the transmission line as it crosses the Meadow River. This argument, however, overlooks the absence of any legal requirement to provide a Protection Plan for the Meadow River crossing.

Article 409 of the license as originally approved requires that Summersville minimize the visual impacts of the powerhouse and the transmission line in the area of the powerhouse. In connection with the original application for a license, no one challenged the visual impact of the transmission line elsewhere, and FERC did not take Article 409 as applying elsewhere. Nonetheless, in considering the amendment, FERC decided to mitigate any adverse visual impacts of the transmission line away from the dam as a condition of approving the amendment. It added Article 414, which requires Summersville to adopt a final design plan for the entire transmission line in consultation with affected property owners and relevant federal and state agencies.

But FERC's imposition of new Article 414 does not give the Association a right to challenge Summersville's Plan under Article 409 based on its inadequacy at the Meadow River crossing. Article 409 never imposed an obligation on Summersville to address the Meadow River crossing.

VI. <u>New Arguments on Appeal</u>

The Association and the AWA have advanced a number of other arguments on appeal that we will not consider. These arguments

13

include allegations that a comprehensive plan was never developed, that FERC failed to follow its own regulations, including 18 C.F.R. § 2.13, and that this matter should be reviewed under the provisions of Executive Order No. 12898 (February 11, 1994) (providing that "each Federal agency shall make achieving environmental justice part of its mission"). Our review of FERC's order is limited by 16 U.S.C. § 825l(b), which provides, "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so." See also Escondido Mut. Water Co. v. La Jolla Band of Mission Indians, 466 U.S. 765, 779 n.23 (1984).

The petitioners argue that they should be excused from this procedural limitation because they were not adequately notified of FERC's actions and were, in effect, ambushed by the application for amendment. As we have already discussed, however, we are satisfied that the petitioners had adequate notice of the proceedings below. Indeed, they participated in them extensively, both through oral testimony and in writing. Moreover, FERC addressed each of their claims in some detail in its various orders. Accordingly, we find no reason to expand our review beyond the limits fixed by Congress.

For the foregoing reasons, we affirm FERC's various orders granting Summersville's application for amendment to its license.

AFFIRMED

14