**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1942

SOUTH CAROLINA COASTAL CONSERVATION LEAGUE; CHARLESTON WATERKEEPER; SOUTH CAROLINA WILDLIFE FEDERATION,

Plaintiffs - Appellants,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Charleston District; MAJ. PATRICK RIPTON, in his official capacity as Acting Commander of the Charleston District; LIEUTENANT GENERAL WILLIAM H. "BUTCH" GRAHAM, JR., in his official capacity as Chief of Engineers; MARK AVERILL, in his official capacity as Acting Secretary of the U.S. Army; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; UNITED STATES FISH AND WILDLIFE SERVICE; WALTER CRUICKSHANK, in his official capacity as Acting Secretary of the United States Department of the Interior,

Defendants - Appellees,

and

TRACT 1 TIMBER, LLC; SEVEN STICKS, LLC; TRACT 7, LLC; CAINHOY LAND AND TIMBER, LLC,

Intervenors/Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Richard Mark Gergel, District Judge.  (2:22-cv-02727-RMG)

Argued:  December 12, 2024                    Decided:  January 31, 2025

Before AGEE, THACKER, and BERNER, Circuit Judges.

_____

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Agee and Judge Berner joined.

_____

**ARGUED:**  Catherine Moore Wannamaker, SOUTHERN ENVIRONMENTAL LAW CENTER, Charleston, South Carolina, for Appellants.  Kevin McArdle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Michael Rhett DeHart, WOMBLE BOND DICKINSON (US) LLP, Charleston, South Carolina, for Appellees. **ON BRIEF:**  Christopher K. DeScherer, Emily C. Wyche, SOUTHERN ENVIRONMENTAL LAW CENTER, Charleston, South Carolina, for Appellants.  Todd Kim, Assistant Attorney General, Bonnie Ballard, Sara E. Costello, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; James F. Choate, Amy M. Schwartz, Office of Counsel, UNITED STATES ARMY CORPS OF ENGINEERS, Washington, D.C.; Helen H. Speights, Office of the Solicitor, UNITED STATES DEPARTMENT OF THE INTERIOR, Washington, D.C., for Federal Appellees.

_____

2

THACKER, Circuit Judge:

South Carolina Coastal Conservation League, Charleston Waterkeeper, and South Carolina Wildlife Federation (collectively, "Appellants") challenge the district court's denial of their motion for a temporary injunction. The requested injunction would halt development of the Cainhoy Plantation ("Cainhoy") in South Carolina while Appellants challenge the validity of the permit issued to the Cainhoy project pursuant to Section 404 of the Clean Water Act. Specifically, Appellants allege the permit violates both the Endangered Species Act because it uses a habitat surrogate to set the level of anticipated take of an endangered species, and the National Environmental Policy Act because the permit was issued after the completion of an Environmental Assessment rather than an Environmental Impact Statement.

Because we conclude that Appellants do not have a sufficient likelihood of success on the merits of their claims, we affirm the district court.

I.

To appropriately frame the relevant facts and procedural history of this case, we find it helpful to first discuss the legal framework underlying the issues.

A.

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to "take a hard look at the environmental consequences of their actions." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 194 (4th Cir. 2009) (citation and internal quotation marks omitted). In doing so, NEPA "does not mandate particular results" or "impose substantive environmental obligations" on an

agency. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). Rather, it prescribes a *process* to ensure that federal decisionmakers consider, and the public is informed about, the potential environmental consequences of federal actions. *Id.*

To accomplish this goal, NEPA directs federal agencies to prepare an Environmental Impact Statement ("EIS") for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But an agency may first prepare an Environmental Assessment ("EA") to determine whether the proposed action will have a significant impact requiring the preparation of an EIS. 40 C.F.R. §§ 1501.4, 1508.9. Determining whether environmental impacts will be "significant" requires consideration of "both the context of the action and the intensity, or severity, of the impact." *Ohio Valley Env't Coalition*, 556 F.3d at 191 (citing 40 C.F.R. § 1508.27(a)). The relevant regulations list several factors an agency should consider in evaluating intensity,[1] including:

> "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, . . . wetlands, wild and scenic rivers, or ecologically critical areas"; the potential for "loss or destruction of significant scientific, cultural, or historical resources"; the "degree to which the effects on the quality of the human environment are likely to be highly controversial"; the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under [the ESA]."

---

[1] As we discuss below, Appellants' arguments relate to these intensity factors.

40 C.F.R. § 1508.27(b) (2020).[2]

If the agency determines that the impacts of its action will not be significant (or will be mitigated below the level of significance), the agency issues a finding of no significant impact in lieu of preparing an EIS. *See Ohio Valley Env't Coalition*, 556 F.3d at 191–92 (citation omitted). And "[a]n agency's decision to rely on an [EA] instead of preparing an [EIS] is entitled to deference." *Mt. Lookout-Mt. Nebo Property Protection Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998) (citations omitted).

When proposed agency action may impact species listed as threatened or endangered, Section 7 of the Endangered Species Act of 1973 (the "ESA"), 16 U.S.C. § 1531 *et seq.*, requires that the agency consult with the Fish and Wildlife Service (the "Service") to ensure that the proposed action is "not likely to jeopardize the continued existence of" a listed species. 16 U.S.C. § 1536(a)(2). When formal consultation is required, the Service issues a Biological Opinion ("BiOp") addressing whether the action is likely to cause jeopardy. *Id.* § 1536(c).

Section 9 of the ESA broadly prohibits the "take" of any listed species. 16 U.S.C. § 1538(a)(1)(B). To "take" means to "harass, harm, . . . wound, [or] kill, . . . or to attempt to engage in any such conduct." *Id.* § 1532(19). If the Service concludes that the proposed agency action is not likely to cause jeopardy but will nonetheless "take" members of a listed species, the Service must provide an Incidental Take Statement ("ITS") with the

---

[2] 40 C.F.R. § 1508.27 was recently amended and recodified at 40 C.F.R. § 1501.3. This change does not meaningfully impact our analysis as the parties contend the regulation in effect at the time of agency decisions underlying this appeal applies.

BiOp.  The ITS must specify the "amount or extent" of incidental take, "reasonable and prudent" mitigation measures, and "terms and conditions" to implement those measures. 50 C.F.R. § 402.14(i)(1)(i)–(iv).  The issuance of a valid ITS exempts the take from the ESA's take prohibition, so long as the take complies with the terms and conditions of the ITS.  16 U.S.C. § 1536(b)(4), (o); *see also id.* § 1538(a)(1)(B).

The ITS must specify "the amount or extent of *anticipated take*."  50 C.F.R. § 402.14(i)(1)(i) (emphasis supplied).  If the project exceeds the level of anticipated take provided in the ITS, consultation with the Service must be reinitiated.  *Id.* § 402.16(a)(1). Thus, in that way, the specified level of anticipated take serves as a reinitiation "trigger." *Sierra Club v. United States Dep't of Interior*, 899 F.3d 260, 270 (4th Cir. 2018).  That is, the ITS is intended to be just that -- a *statement* of the incidental take anticipated due to the agency action.  Though we have sometimes referred to an ITS as a "take limit," *id.*, it is not intended to set a "limit" lower than the actual anticipated take.  Rather, the set level of anticipated take serves as a "limit" only in the sense that if or when that level is exceeded, reinitiation of consultation with the Service is triggered.

The level of anticipated take generally must be expressed as the number of individuals that will be taken.  But the Service may use a surrogate measure, such as the quantity of affected habitat, if "it is not practical to express the amount or extent of anticipated take *or* to monitor take-related impacts in terms of individuals of the listed species."  50 C.F.R. § 402.14(i)(1)(i) (emphasis supplied); *see also* 80 Fed. Reg. 26,832 (May 11, 2015).

6

In addition to explaining why either of those conditions applies, the Service must describe "the causal link between the surrogate and take" and "set[] a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). "A 'causal link' is an 'articulated, rational connection' between the activity and the taking of species." *See Sierra Club*, 899 F.3d at 271 (citation omitted). The Service "establishes a causal link by examining the habitat requirements and behavior of the listed species and determining the effect of the expected habitat modification." *Id.* (citation omitted).

## B.

With that legal background in mind, we turn to the facts of this case.

Tract 1 Timber, LLC; Seven Sticks, LLC; Tract 7, LLC; and Cainhoy Land and Timber, LLC (collectively, "Intervenors") own approximately 16,000 acres of private land in Berkeley County, South Carolina. This includes the 9,037 acre tract at issue in this appeal -- Cainhoy. Intervenors have used Cainhoy as a pine tree timber farm for the last 90 years. In 1996, the city of Charleston, South Carolina, annexed Cainhoy into the city limits. Charleston sought to have Intervenors develop Cainhoy to allow for growth in the city.

Though Cainhoy totals over 9,000 acres, including over 2,500 acres of wetlands, the proposed Cainhoy development will develop only 3,906 acres, including 181.5 acres of wetlands. The remaining acres are to be placed in conservation easements and/or restrictive covenants to permanently protect the property. Cainhoy is planned to be a mixed

7

used commercial and residential development, eventually containing 9,000 homes, schools, city services, and a medical center.

To accomplish the goal of developing Cainhoy, Intervenors began applying for the required permits in 2012. Relevant here, in 2018 Intervenors applied for a permit from the Army Corps of Engineers (the "Corps") pursuant to Section 404 of the Clean Water Act because the project will impact wetlands -- in particular, the 181.5 acres of wetlands that will be filled for development. In compliance with NEPA, the Corps completed an EA to determine whether an EIS was required. And as part of its review, the Corps was required to consult with the Service (together with the Corps, the "Federal Appellees") to determine whether the Cainhoy development project is "likely to jeopardize the continued existence" of a threatened or endangered species. 16 U.S.C. § 1536. Specifically, the Corps evaluated the Cainhoy development's impact on the northern long-eared bat ("NLEB"), which was then listed as threatened, and the endangered red-cockaded woodpecker.

The Service issued an initial BiOp in 2018, which determined that the project was not likely to jeopardize the NLEB or the red-cockaded woodpecker. Then, in 2022, after four years of environmental review, the Corps completed its EA and concluded that issuing the Section 404 permit would not have any significant environmental impacts after accounting for mitigation measures, so no EIS was required.

In completing the EA, the Corps coordinated with other state and federal agencies, participated in community meetings, and solicited and responded to public comments about the Cainhoy development project. Of all the entities involved, only one requested that the Corps complete an EIS. That request came from the lead plaintiff, Appellant South

8

Carolina Coastal Conservation League. The Corps denied this request based upon its conclusion that the EA was legally sufficient. Therefore, the Corps issued the Section 404 Permit, allowing Intervenors to fill 181.5 acres of wetlands, on May 11, 2022. Work on the Cainhoy development began at that time.

Appellants filed this lawsuit in the District of South Carolina on August 17, 2022, alleging that the permit approval was unlawful because it violated NEPA and the ESA. But in 2023, work on Cainhoy was paused, and the lawsuit stayed, while the Federal Appellees reinitiated environmental review of the project because the NLEB had been reclassified as an endangered species.

The NLEB has never been spotted in Cainhoy and was last documented about 8.5 miles away in the Francis Marion National Forest in 2019. As part of the reinitiated consultation with the Service, Intervenors elected to presume the presence of NLEBs on the Cainhoy property rather than conducting surveys to formally confirm or deny their presence. Intervenors made this decision because they believed the cost and time of surveys would render the project infeasible. The Service determined that presuming the presence of the NLEB was acceptable given that the possible surveys would only have confirmed or denied presence, rather than providing more useful data such as population density. Thus, the Service determined that nothing about its review would change if there had been a positive survey rather than a presumption of the NLEB's presence.

In reviewing the Cainhoy development project to determine whether it would jeopardize the existence of NLEBs, the Service determined that the project would remove up to 3,906 acres of suitable roosting and foraging habitat. And it determined that the

9

removal of habitat can result in the lethal and nonlethal take of NLEBs. While NLEBs in South Carolina do not hibernate like bats in more northern states, they do take short winter rests known as torpors. The Service thus determined that the highest risk of mortality to NLEBs would be during the summer occupancy, from April 1 to July 15, and the winter torpor period, from December 15 to February 15. Therefore, the Service restricted Intervenors from conducting tree removal on 2,930 acres during those periods of time. As to the remaining 976 acres of the Cainhoy development, the Service determined that those acres would be cleared, if at all, when individual homeowners purchase plots in the future and clear them for building. Because those acres would not be cleared all at once, but rather in small increments over the 30 year permit term, the Service determined that they could be cleared at any time of the year.

In addition, all tree clearing is subject to additional restrictions in order to minimize impacts on NLEBs, including time of day restrictions to avoid feeding disruptions; minimizing removal of snags (dead or dying trees) that are important to the species; installing artificial roosts to supplement the loss of roosting habitat; complying with state forestry best management practices; and yearly bat monitoring. With these restrictions, the Service determined that "most incidental take [of NLEBs] will be non-lethal and undetectable (e.g., bats fleeing disturbances caused by proposed activities, which creates the likelihood of death or injury due to predation and reduced fitness)." J.A. 188.[3]

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

The Service also believed that any incidental take, lethal or not, would be difficult to detect because (1) the bats are "small and occupy forested habitats"; (2) they form small, widely dispersed colonies and may roost individually, sometimes under loose bark or in tree cavities, making detection difficult; (3) finding dead or injured specimens was unlikely; and, (4) bats are mostly nocturnal. J.A. 188. Therefore, the Service believed it was "not practical to monitor take in terms of the number of individual[]" NLEBs affected. *Id.*

Consequently, instead of setting a numerical limit on the number of individual NLEBs that could be taken, the Service used the habitat acreage as a "surrogate." The Service determined that Intervenors anticipated taking up to 2,930 acres of habitat outside of the sensitive seasons, and up to 976 acres of habitat during any time of year. Due to the nature of the NLEBs and the small portion of available habitat the Cainhoy development would remove -- 3,906 acres out of 12.86 million acres of forest in South Carolina -- the Service "anticipate[d] that the displaced bats will relocate to the remaining forest land within South Carolina," J.A. 174, and determined that it did "not anticipate the neighboring bat population to experience adverse effects." *Id.* at 173.

After the Service provided this information to the Corps in a revised BiOP, the Corps modified the Section 404 permit to incorporate the BiOp's restrictions on tree clearing. And the Corps revised the EA's discussion of the potential impacts of the Cainhoy development to account for the potential impact on NLEBs. Ultimately, the Corps concluded that the EA, rather than an EIS, was still sufficient because the permit

11

modification was "minor" and "will not result in significant individual or cumulative impacts on the human environment." J.A. 271.

Intervenors resumed development of Cainhoy in July 2024. Appellants then filed an Amended Complaint and moved for a temporary restraining order and preliminary injunction on August 1, 2024, arguing that the Corps had acted arbitrarily and capriciously by failing to publish an EIS and that the Service had acted arbitrarily and capriciously by using a habitat surrogate to set the level of anticipated take in the ITS. After extensive briefing and a hearing on the matter, the district court denied Appellants' motion for a preliminary injunction on September 19, 2024. The district court concluded that Appellants did not have a sufficient likelihood of success on the merits of their claims, would not experience irreparable harm in the absence of an injunction, and that the balance of the equities did not fall in their favor.

Appellants timely noted this appeal.

## II.

"This Court reviews a district court's denial of a motion for preliminary injunction for abuse of discretion." *Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017) (citation omitted). A court abuses its discretion in denying preliminary injunctive relief when it "rest[s] its decision on a clearly erroneous finding of a material fact, or misapprehend[s] the law with respect to underlying issues in litigation." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (citation and internal quotation marks omitted). A court also "abuses its discretion when it makes an error of law, or when it

12

ignores unrebutted, legally significant evidence." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019) (internal quotation marks and citations omitted).

III.

A preliminary injunction is "an extraordinary remedy never awarded as of right" but, instead, only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). To obtain a preliminary injunction, the movant must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *See id.* at 20.

The district court determined that Appellants were not likely to succeed on their claims that (1) the Service violated the ESA by using a habitat surrogate in the ITS and (2) the Corps violated NEPA by completing only an EA rather than an EIS. Appellants challenge both rulings on appeal.

A.

First, we consider whether the Service violated the ESA when it used a habitat surrogate in place of defining the number of individual NLEBs the Cainhoy project is anticipated to take.

1.

As we have explained, "[a] habitat surrogate is a way of defining take by the amount of adversely affected habitat rather than by the number of individuals [of the listed species] harassed or killed." *Sierra Club v. United States Dep't of Interior*, 899 F.3d 260, 271 (4th Cir. 2018). To use a surrogate, the Service must determine "it is not practical to express

13

the amount or extent of anticipated take *or* to monitor take-related impacts in terms of individuals of the listed species." 50 C.F.R. § 402.14(i)(1)(i) (emphasis supplied). And it must describe "the causal link between the surrogate and take" and set "a clear standard for determining when the level of anticipated take has been exceeded." *Id.*

In this case, the ITS set the amount of anticipated take as the 3,906 acres of habitat the Cainhoy development is expected to impact. Explaining its decision to not use the number of individual NLEBs impacted as the anticipated take, the Service stated that it "anticipates incidental take of the NLEB . . . will be difficult to detect." J.A. 188. It provided the following reasons for this conclusion:

1.  The individuals are small and occupy forested habitats where they are difficult to find;

2.  Bats form small, widely dispersed maternity colonies, some species occur under loose bark or in the cavities of trees, and males and non-reproductive females may roost individually, which makes finding the species or occupied habitats difficult;

3.  Finding dead or injured specimens during or following Action implementation is unlikely;

4.  Bats are mostly nocturnal; and

5.  Most incidental take will be non-lethal and undetectable (e.g., bats fleeing disturbances caused by proposed activities, which creates the likelihood of death or injury due to predation and reduced fitness).

*Id.*

Thus, because the Service determined that it was "not practical to monitor take in terms of individuals of the listed species," it used acres "of forested habitats removed based on seasonality during the implementation of the action as surrogate measures for the

14

anticipated amount or extent of take caused" by the Cainhoy development.  J.A. 188.

As to the causal connection between the acreage of habitat cleared and the take of NLEBs, the ITS referred back to section 4.6.2 of the BiOp.  Section 4.6.2 explained that "[t]ree removal [for Cainhoy] will affect approximately 3,906 ac[res] of NLEB roosting and foraging habitat."  J.A. 172.  It explained that the habitat removal could result in "potential injury or mortality of NLEB individuals" if they are roosting in trees that are removed or due to the loss of "foraging, commuting, and roosting habitat."  *Id.*  But it also explained that "[t]he amount of mortality would not be determinable since dead NLEBs would likely go unnoticed, and estimating such mortality is difficult since NLEB density data is not available."  *Id.* at 173.

As to the potential for nonlethal harm to NLEBs, the Service explained that NLEBs have the "ability to travel distances spanning further than the" Cainhoy development and "will have flexibility of foraging habitat and breeding opportunity" outside of the acreage to be cleared.  J.A. 173.  "This tree removal represents a small portion of foraging and roosting habitat within the larger forest land available in South Carolina," which the service estimates to be approximately 12.86 million acres.  *Id.* at 174.  Thus, "due to their generalist habits in roost selection and the abundance of forested lands, the potential adverse effects are anticipated to be short-term as the bats will be able to relocate to other forest land within South Carolina."  *Id.*  The Service "anticipate[d] the displaced bats will relocate to the remaining forest land within South Carolina," *id.*, and did "not anticipate the neighboring bat population to experience adverse effects due to the [Cainhoy development]."  *Id.* at 173.

15

2.

Appellants argue that they are likely to succeed on the merits of their claim that this use of a habitat surrogate was unlawful because, in their view, it is not impractical for the Service "to express the amount or extent of anticipated take" as a numeric value. 50 C.F.R. § 402.14(i)(1)(i). Even if we determine that the use of a surrogate was proper, Appellants further argue that the one utilized here fails because it did not sufficiently "[d]escribe[] the causal link between the surrogate and take of the listed species," or "set[] a clear standard for determining when the level of anticipated take has been exceeded." *Id.*

In support of their arguments, Appellants rely heavily on our decision in *Sierra Club*, 899 F.3d 260. As a result, we find it necessary to discuss that case in some depth here. In *Sierra Club*, the Service used habitat surrogates for five listed species, including the NLEB and the smaller Indiana Bat ("Ibat"). 899 F.3d at 274–81.

To explain why it believed setting a number for the anticipated take of Ibats was impractical, the Service provided reasoning similar to that offered here: "incidental take of the Ibat will be difficult to detect for the following reasons: species has small body size, finding a dead or impaired specimen is unlikely, and species occurs in habitat (forest and caves) that makes detection difficult." *Sierra Club*, 899 F.3d at 279 (citation and internal quotation marks omitted). Thus, the Service purported to use a habitat surrogate. However, although the affected habitat was anticipated to be 4,447.982 acres, rather than use that whole amount of acreage as the habitat surrogate, the Service, "without any explanation . . . set the take limit . . . at half" of the anticipated acreage: 2,721.24 acres. *Id.* at 279.

16

In *Sierra Club*, we determined that the surrogate was improper for several reasons. Relevant here, we held that the Service did not demonstrate that a numeric limit was impractical: "The bats may be small, but [the Service] has been able to survey them in the past. Indeed, [the Service] made precise estimates as recently as 2017, determining that there are 425 bats in Virginia and 1,076 in West Virginia." *Sierra Club*, 899 F.3d at 280. Thus, we were not convinced that the small size of the Ibat was sufficient to render using a numerical anticipated take impractical. We noted that the Service had been able to count Ibats in other ITS's, and there was no reason it could not do so in *Sierra Club*, even if it was "difficult." *Id.*

Even if use of a surrogate had been proper, we determined that the one offered was insufficient because it did not set an enforceable trigger. The purported habitat surrogate provided that the anticipated take was a "small percent of individuals present within" half the actual acreage of the project. *Sierra Club*, 899 F.3d at 278 (cleaned up). We explained that it was "impossible to know what a 'small percent' of bats is" when there was no numerical figure attached. *Id.* at 279. And we opined that the anticipated take surrogate would still fail even if the Service removed the "small percent" language because the Service "knows that the pipeline will exceed the geographic bounds" it set, and did not explain why it believed the anticipated take was only half of the acreage of the project. *Id.* at 280.

Similarly, for the NLEB, the Service set the anticipated take in *Sierra Club* as "a small percent of individuals present within 0.4 acres." 899 F.3d at 281 (cleaned up) (citation omitted). We held that the surrogate was invalid because the Service had "not

17

shown that a numeric take limit is impractical in such a small geographic area," and "[a]lthough the geographic bounds are fixed, . . . it is impossible to know how many bats constitute a 'small percent.'" *Id.*

There was only one species where we agreed that the Service had demonstrated a numerical anticipated take was impractical: the Madison Cave Isopod. *Sierra Club*, 899 F.3d at 277–78. The Isopod "is a half-inch crustacean that lives in underground aquifers." *Id.* at 278. We agreed that the Service could use a surrogate rather than a number of individuals for the anticipated take because it "lacked the ability to survey the presence or abundance of the isopods [and instead] assumed that they will be found in the pipeline project area." *Id.* at 277.

Significantly, we were careful to note, however, that for the other species, a lack of surveys calculating the population density was insufficient where the Service "lacked current survey information about many of the species or . . . had not completed the necessary surveys." *Sierra Club*, 899 F.3d at 272. Because the Service "'never state[d] that it is not possible' to obtain or update the survey data and arrive at a numeric take limit," it could not "escape its statutory and regulatory obligations by not obtaining accurate scientific information." *Id.* (citations omitted)

Returning to this case, Appellants argue first, as they did in the district court, that the habitat surrogate was improper because the Service did not demonstrate in the ITS that it was impractical to determine the number of individual bats affected. Appellants point out that the justifications offered for the use of a surrogate in the ITS here are similar to those offered in *Sierra Club*: the bats are small and occupy forested habitats and finding

18

dead or injured specimens is unlikely. And because those justifications were held to be insufficient in *Sierra Club* where the agency had counted the number of bats previously, Appellants argue that they must be insufficient here as well. Moreover, Appellants argue that the fact that NLEBs have been counted in other cases[4] to provide a numeric value for the anticipated take is dispositive -- if they could be counted before, they must be counted here, and the Service must require such counting and set a numerical anticipated take.

The Service counters, as it did below, that use of the surrogate is permissible here because it properly determined that "it is not practical to . . . *monitor* take-related impacts in terms of individuals." 50 C.F.R. § 402.14(i)(1)(i) (emphasis supplied). In particular, it points to its finding that "[m]ost incidental take will be non-lethal and undetectable." J.A. 188. "Take may occur when bats flee tree-clearing and experience nonlethal reductions in fitness or increased predation risk, which cannot be monitored or tracked." Federal Appellees' Response at 20 (citing J.A. 140–41, 172–74, 184, 188).

The Service argues *Sierra Club* is not dispositive on this issue because the facts are distinguishable, given the lack of hibernation of the subject NLEBs and the overall scope of the Cainhoy Development. The Service further argues that the surrogate is proper because it is not practical to estimate the number of individual NLEBs that will be taken. Contrary to Appellants' argument that the Service could have conducted surveys to determine the likely population of NLEBs on the Cainhoy property, the Service explains

---

[4] Appellants point to *Sierra Club*, 899 F.3d at 280, and *Defenders of Wildlife, Inc. v. United States Dep't of Int.*, 931 F.3d 339, 360–63 (4th Cir. 2019).

that the surveys available are only for the purpose of establishing probable presence or absence of NLEBs. They are not for estimating population density. This differs from the facts of *Sierra Club* where the bats were able to be counted in Virginia and West Virginia because there was a hibernaculum[5] within five miles of the project. 899 F.3d at 281. The Service explains that when bats hibernate, they can be counted. But, because bats in coastal South Carolina do not hibernate, the Service avers that is has no reliable methods to determine population density or a specific number of bats that may be present.

In its opinion, the district court determined that *Sierra Club* was distinguishable because of the known hibernaculum and the small area at issue there -- 0.4 acres. Because there are no hibernacula in South Carolina and no NLEBs have been seen on the Cainhoy property, and due to the size of the project area, the district court agreed with the Service that *Sierra Club* was not applicable, let alone controlling here.[6] The district court also pointed out that *Sierra Club* was particularly concerned about the fact that the purported habitat surrogates were limited to some "small percent" subset. 899 F.3d at 281. No such concern exists here. Therefore, the district court determined that Appellants were not likely to succeed on the merits of their claim that the use of a habitat surrogate was improper here.

---

[5] A bat hibernaculum is a shelter, often a cave or mine, occupied by dormant bats during the winter months. *See Hibernaculum*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/hibernaculum [https://perma.cc/32ZH-ZUFQ] (last visited Jan. 6, 2025).

[6] The district court also noted that it was "struck" by the lack of "scientific support challenging the [BiOp]." J.A. 981.

Considering this reasoning, the district court did not abuse its discretion. Here, the Service not only determined that it was impractical "to express the amount or extent of anticipated take" in terms of the number of individual NLEBs, 50 C.F.R. § 402.14(i)(1)(i), it also determined that it was "not practical to monitor take in terms of individuals of the listed species," because most of the take was expected to be "non-lethal and undetectable." J.A. 188. While *Sierra Club* did reject surrogate justifications similar to those here, the BiOp and ITS are more specific in this case. They explain that the reason the take is expected to be mostly nonlethal and undetectable is that NLEBs are expected to simply "relocate to the remaining forest land within South Carolina," *id.* at 174, and that any nonlethal take experienced when a NLEB flees a tree and experiences "reduced fitness" from having a travel farther to a new roost, *id.* at 188, is undetectable. That point is well taken, particularly considering the fact that the 263,904-acre Francis Marion National Forest is adjacent to Cainhoy, all of which is in a protected status.

Appellants protest that even if the use of a surrogate is proper here, the Service's proffered surrogate fails because it did not sufficiently "[d]escribe[] the causal link between the surrogate and take of the listed species," or "set[] a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). The district court rejected these arguments and determined that the casual link described in the ITS was sufficient because it explained that "tree removal will affect 3,906 ac[res] of NLEB roosting and foraging habitat," and that the takes expected would be caused by the tree clearing activity. J.A. 1029–30; J.A. 172. As to whether the surrogate set a clear standard, the district court determined that the habitat surrogate was enforceable because "reinitiation

21

of consultation will be triggered if the project exceeds the anticipated 3,906 acres, if any acreage is cleared within sensitive seasons, or if developers do not comply with the special conditions of the [404] permit." *Id.* at 1030.

Here, too, we conclude that the district court did not abuse its discretion. The causal link between the use of the acres of destroyed habitat and any incidental take of NLEBs is clear. On its face, the ITS explains that "[i]n this case, the Service is using ac[res] of forested habitats removed based on seasonality during the implementation of the action as surrogate measures for the anticipated amount or extent of take caused by the proposed Action." J.A. 188. And the ITS points to Section 4.6 of the BiOp for further explanation. That section explains that the consequences of habitat removal "include potential injury or mortality of NLEB individuals roosting in trees that are removed, and loss of foraging, commuting, and roosting habitat." *Id.* at 172. It further explains that the "NLEB may be injured or killed while fleeing disturbance . . . [and] [a]dditional effects may include reduced fitness of NLEB individuals through additional energy expenditure while searching for a new roost site, or a shift in home range." *Id.* Additionally, the habitat surrogate of 3,906 acres is sufficiently enforceable -- if Intervenors clear even one extra acre, or clear any acreage outside of the specified time periods, reinitiation of consultation with the Service will be triggered. That is all that is required.

### B.

We next consider whether the district court abused its discretion when it determined that Appellants were not likely to succeed on their claim that the Section 404 permit violated NEPA where the Corps issued an EA rather than an EIS. As we have explained,

22

an agency may prepare an EA to determine whether a proposed action will have a significant impact on the human environment, such that it requires an EIS. 40 C.F.R. §§ 1501.4, 1508.9.1.

"An agency's decision to rely on an [EA] instead of preparing an [EIS] is entitled to deference." *Mt. Lookout-Mt. Nebo Property Protection Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998) (citations omitted). Thus, review on the merits "is limited to the question of whether [the agency] reasonably concluded that the [proposed action] would not significantly impact the quality of the human environment." *Id.* "In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Ohio Valley Env't Coalition v. Aracoma Coal*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* (internal quotation marks omitted). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Id.* (cleaned up) (citations omitted).

Appellants argue that the Corps was arbitrary and capricious in its decision not to prepare an EIS because comments Appellants filed in response to public notice of the proposed permit approval pointed out that several of the "intensity factors" listed in 40 C.F.R. § 1508.27(b), *see supra* at 4, applied to the Cainhoy development such that the EA

23

was not sufficient. In their comments, Appellants raised concerns about the significance of the harm to endangered species; the effects and risks of placing the development in a flood zone; the effect of filling 180 acres of wetlands; the risk that docks will proliferate surrounding creeks after the development of waterfront homes; the impact on nearby historic settlement communities; and the impact on the Francis Marion National Forest, including making it more difficult for the Forest to execute necessary prescribed fires for maintenance. And, in Appellants' view, the EA did not adequately address or consider these concerns and should have determined that they may be significant and, therefore, required that an EIS be prepared.

The district court determined that the Appellants did not have a sufficient likelihood of success on this claim because the EA "provides considerable discussion of the Project's impacts on the land and surrounding communities and responds to comments raised by [Appellants] throughout the environmental comment and review period." J.A. 1023. The district court provided specific examples in its opinion as to how the EA considered the risk to endangered species but determined that risk was mitigated below a significant level. To be sure, the district court did not specifically consider the EA's response to any of the other issues raised by Appellants beyond noting that the EA substantively responded to each of the concerns. Our own review nevertheless reveals that the EA expended fourteen pages to specifically considering and responding to each of Appellants' concerns.

Appellants argue on appeal, however, that the district court erred in its analysis because it did not conduct a review of each of the significance factors itself to determine whether the Cainhoy project required an EIS. Appellants are incorrect. Contrary to

24

Appellants' assertions, the district court was not free to evaluate the significance of the Cainhoy development of its own accord, other than for clear error, because a "court is not empowered to substitute its judgment for that of the agency." *Ohio Valley Env't Coalition*, 556 F.3d at 192 (quoting *Citizens To Preserve Overton Park, Inc.*, 401 U.S. at 416)). Instead, even on the merits, the district court would be limited to determining whether the Corps took the required "hard look" at the environmental consequences. *Ohio Valley Env't Coalition*, 556 F.3d at 194. That is, it could only evaluate "whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.*

Given the procedural posture of this case, where the district court was required to determine only whether Appellants had a sufficient likelihood of success on the merits of their claim, we conclude that the district court did not abuse its discretion. The district court's opinion makes clear that it reviewed the EA and determined that the Corps considered each of the factors and issues raised by Appellants. At this stage, the district court was satisfied that Appellants had not demonstrated a likelihood of success on their claim that the Corps did not take the required hard look. So are we.

## C.

Because we conclude that the district court did not abuse its discretion in determining Appellants do not have a sufficient likelihood of success on the merits of their claims, we need not consider the other preliminary injunction factors.

## IV.

The judgment of the district court is

*AFFIRMED*.

25